UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELISHA CIMEON JOHNSON, APRIL HARESCO, and A.J., a minor child, by her general guardian or next friend April Haresco,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>JEREMY ENGBAUM, in his individual capacity, and CITY OF BUHL, IDAHO,<br><br>　　　　Defendants. | Case No. 1:24-cv-00218-REP<br><br>**MEMORANDUM DECISION AND ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO STRIKE** |

Before the Court are the parties' cross motions for summary judgment. Dkts. 24, 28, and 30. Also pending are Defendants' motions to strike. Dkts. 38 and 39. All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. Dkt. 10. Having carefully considered the record, heard oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order.

## I. BACKGROUND

This lawsuit brought under 42 U.S.C. § 1983 stems from a traffic stop of Plaintiff Elisha Johnson in the driveway of his home. During that stop, Johnson initially engaged with the officer from inside his parked vehicle. But after the officer returned to his patrol car, Johnson pulled his vehicle forward and parked it closer to his house, exited his vehicle against the instructions of the officer, and entered his house. After a standoff at Johnson's front door, officers entered his home to arrest him, tasing him twice in the process. This suit followed.

### A.    The Stop of Plaintiff's Vehicle

**MEMORANDUM DECISION AND ORDER - 1**

The following facts are largely undisputed and captured on body camera. On December 21, 2023, a Buhl City Police Department (BCPD) officer, Jason Potter, was patrolling with another officer when he observed Plaintiff Johnson driving above the speed limit. Officer Potter stopped Johnson as he was returning home. Johnson pulled over into the front portion of his driveway, and Officer Potter parked directly behind him.

Officer Potter approached the vehicle, introduced himself, and asked for Johnson's license, registration, and insurance. He then asked him if there were any firearms in the car. When Johnson responded "no," Officer Potter asked if he was carrying any drugs. Johnson again responded in the negative, asking Officer Potter why he needed to ask about drugs during a speeding stop. Officer Potter replied that this was his typical practice and returned to his patrol car to run Mr. Johnson's license and write him a ticket.

Roughly five-and-a-half minutes into the traffic stop, and three minutes after Officer Potter returned to his patrol car, Johnson put his car in drive and pulled forward up his driveway. He parked in front of his garage, exited the vehicle, and walked to the front door of his house.

Officer Potter noticed Johnson's movement and yelled at him to remain in his car until the stop was over. Johnson responded that he was not being detained and that Officer Potter could leave the ticket on his vehicle. Amidst their back and forth, Officer Potter informed Johnson that his chief (Jeremy Engbaum, BCPD's chief of police) was on his way. Johnson replied that he would talk to Chief Engbaum, not Officer Potter, and shut his front door behind him.

### B.    The Altercation at Plaintiff's Front Door

Shortly after Johnson entered his home, Chief Engbaum arrived at the scene. Officer Potter informed him that Johnson was willing to talk. Chief Engbaum then approached Mr.

**MEMORANDUM DECISION AND ORDER - 2**

Johnson's door and knocked. April Haresco, Johnson's wife, answered the door. Chief Engbaum asked if Johnson would talk with him. Ms. Haresco replied that she would ask him and closed the door.

A moment later, Johnson opened the door but remained inside the house just beyond the threshold. Chief Engbaum requested that he come outside. Johnson refused. Chief Engbaum then explained that he had two options: come outside and let officers issue him the citation for speeding or be arrested for obstruction. Johnson said he would accept the citation but would not leave his house. Chief Engbaum reiterated that Johnson needed to come outside and stand by his car to receive the citation.

After a back-and-forth lasting just under two minutes, with Johnson standing just inside his threshold and Chief Engbaum at the doorstep, Johnson announced his intention to call a lawyer, stepped back, and began to close his door. Chief Engbaum immediately stepped forward and wedged his foot in the door, preventing it from closing. Johnson objected that Engbaum had crossed the threshold of his home.

The situation escalated: Johnson applied pressure to close the door, while Engbaum prevented this by keeping his foot wedged in the crack. Briefly, Chief Engbaum again tried to persuade Johnson to exit his house and accept the citation. However, he soon changed his tone and told Johnson that he was under arrest. When Johnson continued to try to close the door, Chief Engbaum threatened to tase him if he did not comply with his directions and open the door.

Two minutes after Chief Engbaum first put his foot in Johnson's door, Chief Engbaum instructed Officer Potter and Deputy Gorrell (from the Twin Falls Sheriff's Office) to breach the door. They did so, and a brief struggle ensued as the three officers forced the door open and

**MEMORANDUM DECISION AND ORDER - 3**

grabbed Johnson. Chief Engbaum tased Johnson twice in the altercation. Haresco and A.J., the couple's minor daughter, witnessed the scuffle; Haresco screamed for the officers to stop. The officers wrestled Johnson out of his home onto his lawn, where they handcuffed him.

### C.    Procedural History

Johnson and his wife brought this action under § 1983 against both the City of Buhl and Chief Engbaum in his individual capacity. Their complaint alleges seven overlapping claims of violation of the Fourth Amendment's protection against unreasonable searches and seizures and use of excessive force.

The parties filed cross motions for summary judgment. Dkts. 24, 28, and 30. In addition, Defendants filed motions to strike. Dkts. 38 and 39. On July 29, 2025, the Court heard oral argument on the motions.

## II. <u>LEGAL STANDARDS</u>

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. at 252.

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id*. at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing evidence in the light most favorable to the

**MEMORANDUM DECISION AND ORDER - 4**

nonmoving party, we must determine whether there any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000)). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

The court evaluates cross motions for summary judgment individually, with each standing or falling on its own merit. *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

### B.    Qualified Immunity

Qualified immunity shields law enforcement officials from liability for harm caused by reasonable mistakes, protecting all but the "plainly incompetent or those who knowingly violate the law." *Easley v. City of Riverside*, 890 F.3d 851, 856 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). The qualified immunity inquiry proceeds in two steps. When a defendant asserts qualified immunity, the Court must evaluate: (i) whether the defendant violated a constitutional right, and (ii) whether that constitutional right was clearly established at the time of the defendants' conduct, i.e., whether the contours of the right were sufficiently well developed that a reasonable official should have known his conduct was unlawful. *Id.* Unless the answer to both questions is "yes," the defendant is entitled to immunity. *Id.*

In conducting this inquiry, the Court adopts the plaintiff's version of the facts. *Tolan*, 572 U.S. at 655-656; *Easley*, 890 F.3d at 856 (evaluating a qualified immunity summary judgment motion by drawing factual inferences in the light most favorable to the plaintiff, the nonmoving party). The Court maintains discretion to address either prong of the qualified immunity analysis first. *Easley*, 890 F.3d at 856.

**MEMORANDUM DECISION AND ORDER - 5**

### III. <u>DISCUSSION</u>

**A.    The Warrantless Entry into Plaintiffs' Home and Arrest of Plaintiff**

Plaintiffs assert five[1] overlapping Fourth Amendment claims that all present the same question: whether Chief Engbaum and the officers who assisted him were required to obtain a warrant before entering Plaintiffs' home to effectuate the arrest of Plaintiff Johnson. The parties have markedly different conceptions of how this question should be answered. Plaintiffs emphasize the sanctity of the home, while Defendants insist that an individual who voluntarily opens their door to the police has no right to "defeat" an arrest by subsequently shutting the door and ending the encounter. Each side claims that binding Supreme Court and Ninth Circuit law supports their respective position. And the parties devote significant time in their briefing to distinguishing the other side's primary cases. To resolve this dispute, it is helpful to begin with basic Fourth Amendment principles.

The Fourth Amendment protects a specific list of places, including the home, from "unreasonable searches and seizures." Its protections generally reach their apex when it comes to the home. *See Lange v. California*, 594 U.S. 295, 303 (2021) (for purposes of the Fourth Amendment, "the home is first among equals"). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citing *Coolidge v. New*

---

[1] Claim I is an unlawful search claim that alleges that Chief Engbaum unlawfully put his foot into Plaintiffs' door without a warrant; Claim II is an unlawful search claim brought against Chief Engbaum for pushing open Plaintiffs' door and entering Plaintiffs' home; Claim III is an unlawful seizure claim, brought only against Chief Engbaum, by Plaintiff Johnson for arresting him in his home without a warrant; Claim VI is a municipal liability claim that seeks to hold the City of Buhl liable for the warrantless entry into the Plaintiffs' home; finally, Claim VII is a municipal liability claim that seeks to hold the City of Buhl liable for the warrantless arrest of Plaintiff Johnson. Claims IV and V involve allegations of excessive force and are addressed *infra*.

**MEMORANDUM DECISION AND ORDER - 6**

*Hampshire,* 403 U.S. 443, 474-75 (1971)). "[P]olice officers may not execute a warrantless arrest in a home unless they have both probable cause and exigent circumstances," or unless they satisfy some other recognized exception to the warrant requirement, such as consent. *Hopkins v. Bonvicino*, 573 F.3d 752, 773 (9th Cir. 2009).

In this case, it is undisputed that officers did not have a warrant, consent, or exigency.[2] Instead, the dispute centers on whether the arrest occurred "inside" Plaintiffs' home, as that term is used in Fourth Amendment law, or in a "public doorway" that, in some cases, is not subject to Fourth Amendment protection. In short, the parties disagree about whether the arrest of Johnson involved the kind of intrusion into the home that triggers Fourth Amendment concern.

The Supreme Court has adopted two different tests for answering such questions: the reasonable-expectation-of-privacy test and the common law trespassory test. First, in *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court held that a Fourth Amendment search occurs if the government infringes on an individual's reasonable expectation of privacy. *Id.* at 361 (Harlan, J., concurring). Second, in a line of cases beginning in 2012 with *United States v. Jones*, 565 U.S. 400 (2012), the Supreme Court reaffirmed the common law principle that a Fourth Amendment search also occurs when law enforcement "physically intrud[es] on a constitutionally protected area" to obtain information. *Id.* at 406 n.3.

These are independent tests. A plaintiff may establish that a search of the home has occurred under either the *Katz* reasonable-expectation-of-privacy test or under the *Jones* common law trespassory test. *See Florida v. Jardines*, 569 U.S. 1, 11 (2013) (stressing that the reasonable expectation of privacy test has been "added to, not substituted for" traditional Fourth

---

[2] At the motions hearing, Defendants expressly waived any claim of exigency or hot pursuit.

**MEMORANDUM DECISION AND ORDER - 7**

Amendment property protections); *see also United States v. Duenas*, 691 F.3d 1070, 1080-1081 (9th Cir. 2012) ("In *Jones*, the Court reaffirmed that the home and its curtilage are sacrosanct, and that nothing in *Katz* requires courts to apply the reasonable expectation of privacy standard in addition to finding that the subject of the search was 'persons, houses, papers, [or] effects.'")

Plaintiffs argue that the officers' entry into their home constituted a presumptively unlawful search under both lines of caselaw. The Court agrees.

### i.    *The Common Law Trespassory Test*

The trespassory test protects against physical intrusions into constitutionally protected areas, regardless of whether those intrusions implicate a property owner's privacy interest. The trespassory test is rooted in the common law – dating back to the adoption of the Fourth Amendment – that recognized the sanctity of property rights. Most prominently, the Supreme Court applied this test in *Olmstead v. United States,* 277 U.S. 438, 466 (1928), where it held that wiretapping of a telephone line was not a search and seizure because it did not involve a physical intrusion into the suspect's home.

This test reemerged in 2012 in *Jones*. There, law enforcement obtained a warrant authorizing the use of a GPS tracking device on a vehicle registered to the suspect's wife. 565 U.S. at 402-03. After the warrant had expired, officers physically installed the device on the suspect's vehicle while it was parked in a public parking lot. *Id.* at 403. For the next 28 days, they used it to monitor the vehicle's movement. *Id.* The Supreme Court found that the officers, in accessing the vehicle to install the device, "physically occupied private property for the purpose of obtaining information." *Id.* at 404. In other words, the officers committed a trespass under traditional Fourth Amendment jurisprudence. *Id.* at 405. Accordingly, the Supreme Court held

**MEMORANDUM DECISION AND ORDER - 8**

that the installation of the device, and its subsequent use to monitor the vehicle's movements, constituted a warrantless search in violation of the Fourth Amendment. 565 U.S. at 404.

A year later, the Court refined the trespassory test in *Jardines*. There, officers accessed the defendant's front porch without a warrant and walked a drug-sniffing dog around the porch. 569 U.S. at 4. The Supreme Court determined that the front porch – as an area "immediately surrounding and associated with the home" (i.e., curtilage) – was a constitutionally-protected area. *Id.* at 6-7. And while officers might have had an implied license to access the porch to approach the front door and knock, they exceeded that license to conduct a drug-dog investigation all around the porch. *Id.* at 8-9. Therefore, the Court found a warrantless search and a Fourth Amendment violation. *Id.* at 11-12.

Most recently, in *Collins v. Virginia*, 584 U.S. 586 (2018), the Court refused to extend the automobile exception to the warrant requirement for a search of a vehicle parked on the curtilage of a home. There, an officer was investigating a stolen motorcycle. *Id.* at 589. He located the motorcycle at the house of the suspect's girlfriend. *Id.* Covered by a tarp, the motorcycle was parked in the driveway in a spot adjacent to the house. *Id.* Without a warrant, the officer removed the tarp and confirmed that it was the suspected stolen motorcycle. *Id.* at 589-90. The district court denied defendant's motion to suppress. *Id.* at 590. On appeal, the Supreme Court held that the subject portion of driveway – immediately adjacent to the house and partially enclosed – was constitutionally-protected curtilage and a warrant was required to search it. *Id.* at 593-94. The Court refused to apply the automobile exception because the officer did not have lawful access to the vehicle to begin with, having trespassed on curtilage to investigate it. *Id.* at 594-95. Thus, the Supreme Court reversed and remanded. *Id.* at 601.

**MEMORANDUM DECISION AND ORDER - 9**

As this line of cases makes clear, law enforcement does not have free rein to access private property, or the curtilage surrounding a home, without a search warrant. A person standing inside of their own home is accorded even greater protections. Critically, law enforcement cannot access curtilage or the home without a search warrant even if it has probable cause to arrest a suspect who is located there (absent an exigency).

For instance, in *United States v. Lundin*, 817 F.3d 1151 (9th Cir. 2016), officers approached defendant's home without a search warrant, but intending to arrest him for burglary, kidnapping, and brandishing a firearm, among other crimes. *Id.* at 1155-56. Officers twice loudly knocked on defendant's front door. *Id.* at 1156. Thereafter, defendant fled from the rear patio and was apprehended in his back yard. *Id.* Officers then searched defendant's back yard and patio (and later inside his home). *Id.* On the patio, officers recovered a clear plastic freezer bag containing two handguns. *Id.* Prior to trial, defendant challenged the seizure of the two handguns. *Id.* at 1157. The government claimed that law enforcement's presence on the patio, and subsequent warrantless search that yielded the handguns, was justified under the "knock and talk" exception to the warrant requirement. *Id.* at 1158. The Ninth Circuit disagreed. The Ninth Circuit held that the officers exceeded the limited license of a knock and talk; they accessed the curtilage of defendant's home not to talk to him, but rather, to arrest him. *Id.* at 1159. Accordingly, officers committed a trespass under the reasoning of *Jardines* and violated defendant's Fourth Amendment rights.

The Ninth Circuit's holding in *Lundin* is consistent with other cases that require a search warrant, consent, or exigency to enter a defendant's home or curtilage to effectuate an arrest. *See, e.g., Lange v. California*, 594 U.S. 295, 298 (2021) ("The Fourth Amendment ordinarily requires that police officers get a warrant before entering a home without permission."); *United*

**MEMORANDUM DECISION AND ORDER - 10**

*States v. Perea-Rey*, 680 F.3d 1179, 1186 (9th Cir. 2012) (police officers "must either obtain a warrant or consent to enter before arresting a person inside a home or its curtilage"). Such is the general rule for arrests in or around a suspect's home under the post-*Jones* trespassory line of cases. And that general rule supports Plaintiffs' argument that Chief Engbaum and the officers who assisted him conducted an unlawful search when they arrested Plaintiff Johnson at his home.

Defendants counter and invoke the exception to this general rule for "open door" or "doorway" arrests. In support, they cite *United States v. Santana*, 427 U.S. 38 (1976) and *United States v. Vaneaton*, 49 F.3d 1423 (9th Cir. 1995). In *Santana,* an undercover officer arranged a purchase of heroin through a courier associated with the defendant. 427 U.S. at 39. The officer met with the courier in his vehicle and provided the courier with pre-recorded buy money. *Id.* at 39-40. The courier entered defendant's residence and returned to the officer's vehicle shortly thereafter. *Id.* at 40. The courier handed the officer the heroin and the officer immediately arrested her. *Id.* The courier confirmed that she obtained the heroin from the defendant and that the defendant had the buy money. *Id*. Officers responded to defendant's home and saw her standing in the doorway with a paper bag in her hand. *Id.* Officers approached and yelled "police." *Id.* Defendant retreated into the vestibule of her house. *Id.* Officers followed her through the open door and arrested her in the vestibule. *Id.* Inside the paper bag she was holding was heroin; inside her pocket was a portion of the undercover officer's buy money. *Id.* at 41.

Defendant moved to suppress the heroin and buy money. *Id.* The district court granted the motion and the circuit court affirmed. *Id.* The Supreme Court reversed. The Supreme Court held that defendant was standing in a public place where she had no reasonable expectation of privacy – her open doorway – when officers initiated her arrest. *Id.* at 42 (stating that "[defendant] was

**MEMORANDUM DECISION AND ORDER - 11**

not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house."). Thus, no search warrant was required to arrest her. That defendant then retreated into her vestibule could not thwart the lawful arrest because the officers were permitted a warrantless entry into the vestibule under the "hot pursuit" exception to prevent destruction of evidence. *Id.*

In *Vaneaton,* officers were investigating a string of residential burglaries in Bend, Oregon. 49 F.3d at 1424. Having recently been arrested (and released) for a parole violation for pawning stolen goods in Portland, defendant was a prime suspect. *Id.* Officers learned that defendant had been in Bend at the time of the robberies, and to their surprise, had returned to Bend after his arrest in Portland and was staying at a local motel. *Id.* at 1425. Officers approached defendant's motel room with the intent to arrest him for the Bend burglaries. *Id.* Uniformed officers knocked on his door but said nothing. *Id.* Defendant opened the curtains, peered through the window, and voluntarily opened the door of his room. *Id.* Officers confirmed his identity and then arrested him at the doorway, but just inside the threshold. *Id.* After being *Mirandized,* defendant gave officers permission to search his room, where they located a gun. Prior to trial, defendant moved to suppress the gun because the search was warrantless. *Id.* at 1424. The district court denied the motion.

The Ninth Circuit affirmed. Applying privacy principles, the Court held that defendant "voluntarily exposed himself to warrantless arrest" by opening his motel room door in response to a non-coercive knock by the police. *Id.* at 1426. The Court reasoned that the police used no subterfuge or coercion to coax defendant to open the door and did not enter the room until they formally placed him under arrest. *Id.* at 1427. Thus, the Court held that defendant's "zone of privacy" was not implicated. *Id.* (citing *Payton v. New York,* 445 U.S. 573 (1980)).

**MEMORANDUM DECISION AND ORDER - 12**

Together, these cases upheld "doorway" arrests as public arrests under a privacy-based framework. In each of those cases, defendants voluntarily appeared in the doorway of a dwelling and were subsequently arrested. Accordingly, the Supreme Court and Ninth Circuit, respectively, found that there was no violation of defendants' reasonable expectation of privacy and upheld their warrantless arrests.

The Court agrees with Plaintiffs that the reasoning of *Santana* and *Vaneaton* has been eroded by *Jones*, *Jardines*, and *Collins* (and their progeny) which followed. In this line of cases, the Supreme Court clarified that privacy is not the exclusive touchstone of the Fourth Amendment; instead, property rights remain an independent and equally important Fourth Amendment consideration. *Jardines*, 569 U.S. at 10. Older cases – like *Vaneaton* – consequently are of questionable viability *to the extent* that they rely exclusively on a privacy-based analysis to find that a physical intrusion into a constitutionally protected area, such as a home, is not a Fourth Amendment search.

None of the post-*Jones* cases that Defendants cite say otherwise. Take, for instance, *Reyes v. City of Santa Ana*, 832 F. App'x 487 (9th Cir. 2020) (unpublished). There, Appellant was the suspect in the robbery of a cellular telephone retail store. *Id.* at 489. Officers responded to Appellant's apartment complex to arrest him. *Id.* They assembled on an open and unobstructed outdoor walkway in front of Appellant's apartment. *Id.* An officer twice knocked on Appellant's door. *Id.* Appellant opened the door. *Id.* Officers asked Appellant to put his hands up and exit the apartment. *Id.* Appellant complied and stepped into his doorway. *Id.* As he passed through the doorway, officers arrested him. *Id.*  The district court granted Appellee's motion for summary judgment on qualified immunity grounds. *Id.*

**MEMORANDUM DECISION AND ORDER - 13**

On appeal, the parties agreed that the officers executed a doorway exception arrest under *Vaneaton. Id.* However, Appellant argued that *Vaneaton's* doorway arrest exception had been abrogated by *Jardines. Id.* The Ninth Circuit acknowledged the tension between the two cases but distinguished them: *Vaneaton* involved officers standing on public property (motel common space) while *Jardines* involved officers intruding on home curtilage (a front porch). *Id.* Given the distinction, the Ninth Circuit held that held that the two cases were not clearly irreconcilable and that *Vaneaton* remained good law. *Id.* As such, the Ninth Circuit found that there was no violation of clearly established right of which a reasonable person would have been aware by arresting Appellant in his doorway. *Id.* Accordingly, the Ninth Circuit affirmed summary judgment.

While the holding in *Reyes* may support Chief Engbaum's assertion of qualified immunity, *see infra Section III.A.iii.,* it does not support Defendants' argument that Chief Engbaum and his fellow officers conducted a lawful search under the post-*Jones* trespassory line of cases. That is because – unlike the officers in *Reyes* who remained on a public walkway and arrested the defendant after he left his home – officers here were on Plaintiffs' private property throughout the encounter and intruded into the interior of the home to arrest Johnson.[3]

Defendants also cite *Uzun v. City of Santa Monica,* No. 2:20-CV-05756-SB-MAA, 2021 WL 3160191 (C.D. Cal. June 29, 2021). In that case, officers responded to Plaintiff's home with probable cause to arrest him for misdemeanor child abuse and domestic battery. *Id.* at *2. Officers spent approximately five minutes attempting to speak with Plaintiff through the closed front door. *Id.* They requested that Plaintiff come outside to talk. *Id.* Eventually, Plaintiff opened

---

[3] Additionally, *Reyes* is unpublished, and therefore, is not binding authority.

**MEMORANDUM DECISION AND ORDER - 14**

the door and stood in the threshold. *Id.* Officers questioned Plaintiff about the altercation with his

child. *Id.* After two minutes, officers asked if Plaintiff had any weapons. *Id.* Plaintiff denied

carrying weapons. *Id.* In response, an officer asked Plaintiff to step outside his house and onto

his porch for a search. *Id.* Plaintiff consented and stepped out of his house. *Id.* After a brief step

back inside, Plaintiff again stepped out of his house. *Id.* Officers then took Plaintiff into custody.

*Id.*

Based on these facts, the district court granted summary judgment for Defendants. *Id.* at

*5. Citing both *Vaneaton* and *Santana* – reasonable expectation of privacy cases – the district

court held that "[t]he moment Plaintiff appeared in the doorway of his home to speak with the

Officers, he entered a public place and was subject to a warrantless arrest . . . even if he had

retreated into his house." *Id.* at *6 (citations omitted). Thus, the district court concluded there

was no wrongful arrest based on a warrantless search. *Id.* Crucially, in so holding, the district

court completely failed to address the post-*Jones* trespassory line of Supreme Court cases. Given

this glaring omission – and the fact that this is an out-of-district, unpublished district court

opinion – *Uzun* is not persuasive authority.

In sum, Defendants have not identified any post-*Jones* case law to support their position.

This is unsurprising. If Defendants were correct that officers may cross a threshold and

physically enter a home to conduct a warrantless "doorway" arrest, that would mean that an

individual standing inside the entryway of a home enjoys less protection than a car sitting in a

partially enclosed driveway (*Collins*) or a person standing in an open garage or carport (*Lange*

and *Perea-Rey*). All this despite the home being celebrated as the most carefully guarded place in

American constitutional law.

**MEMORANDUM DECISION AND ORDER - 15**

Such a result would be "clearly irreconcilable" with *Jones*, *Jardines*, *Collins*, *Lange*, *Lundin*, and a wealth of other Ninth Circuit cases. As the Ninth Circuit has explained, "[t]he ability to observe part of the curtilage or the interior of a home does not authorize law enforcement, without a warrant, to then enter those areas to conduct searches or seizures." *Perea-Rey*, 680 F.3d at 1186. Chief Engbaum violated this bright-line principle when he crossed into Plaintiffs' home to arrest Johnson without a warrant, consent, or a showing of exigency.

This Court's decision could stop here. *See Whalen v. McMullen*, 907 F.3d 1139, 1147 (9th Cir. 2018) ("Only where the search did not involve a physical trespass do courts need to consult *Katz's* reasonable-expectation-of-privacy test."). However, because the Ninth Circuit has refrained from directly overruling *Vaneaton*, the Court will analyze Plaintiffs' Fourth Amendment warrantless entry claim under a purely privacy-based framework and explain why this framework provides an alternative basis for judgment in Plaintiffs' favor on the issue.

### ii.     *The Reasonable-Expectation-of-Privacy Test*

Plaintiffs argue that even if *Vaneaton* remains good law, "[t]here are a legion of reasons [its] exceedingly narrow open-door-arrest exception . . . is inapplicable here." Pls.' Rsp. at 5 (Dkt. 21). The Court agrees.

The exception for warrantless doorway arrests is, like all exceptions to the warrant requirement, "narrow" and "rigorously guarded to prevent any expansion that would unduly interfere with the sanctity of the home." *Hopkins*, 573 F.3d at 763. Indeed, in case after case, the Ninth Circuit has refused to expand *Vaneaton* beyond the very specific circumstances presented therein.

For example, in *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000), officers investigated a disturbing the peace complaint at Plaintiff's apartment. Officers responded to

**MEMORANDUM DECISION AND ORDER - 16**

Plaintiff's apartment door and stood outside as Plaintiff's roommate greeted them. *Id.* at 951. Officers requested to speak with Plaintiff. *Id.* Plaintiff heard the request. *Id.* He stood well inside his apartment and not at the doorway. *Id.* He identified himself. *Id.* An officer asked him to step outside, but he refused. *Id.* The officer then asked if he could enter the apartment and Plaintiff again refused. After this refusal, the officer tried to reach inside and grab Plaintiff's shirt to pull him out. *Id.* Plaintiff's shirt tore and he stepped back. *Id.* The officer told Plaintiff he was going to be placed under arrest for obstructing a police investigation and asked if he would submit to being arrested. *Id.* at 951-52. Plaintiff said "no." *Id.* at 952. The officer then knocked Plaintiff to the ground inside his apartment and forcibly arrested him. *Id.*

The law enforcement defendants argued this was a valid doorway arrest under *Santana* and *Vaneaton*. *Id.* at 955. The Ninth Circuit disagreed. It held that "[t]he arrest took place only after the officers had crossed the threshold of the door and entered LaLonde's apartment. Thus the present case does not fall under the doorway exception." *Id.* (citations omitted). In other words, the doorway arrest exception is limited to the actual doorway. Moreover, the Ninth Circuit held that officers were not entitled to pursue Plaintiff into his apartment after he retreated further into it against officer orders. *Id.* Any such intrusion must be justified under the "hot pursuit" doctrine. *Id.* (explaining that *Santana* was a "hot pursuit" case, which "turned on exigent circumstances related to Santana's crime"); *see also Anderson v. Long Beach City*, 81 F. App'x 703, 706 (9th Cir. 2003) (unpublished) (doorway exception did not apply where the plaintiff backed away from her doorway into her residence and only then did the officer cross the threshold and arrest her, while she was "several feet" inside her home).[4] The Ninth Circuit

---

[4] In 2021, the Supreme Court affirmed this narrow reading of *Santana*, stressing that it had upheld the warrantless pursuit in that case as a "hot pursuit", even though the chase "ended almost as soon as it began." *Lange*, 594 U.S. at 304 (explaining that some of the language in *Santana* is broadly framed, but

**MEMORANDUM DECISION AND ORDER - 17**

determined that an exigency justifying the hot pursuit exception not exist under the facts of the case. Not only that, it questioned whether such an exigency could ever exist in a misdemeanor case. *Id.* at 956. Accordingly, the Ninth Circuit reversed the district court's decision granting the defendant officers qualified immunity. *Id.* at 962.

The same year *LaLonde* was published, the Ninth Circuit addressed the scope of *Vaneaton* again in *United States v. Oaxaca*, 233 F.3d 1154 (9th Cir. 2000). There, law enforcement responded to Defendant's home to arrest him for conspiracy to distribute methamphetamine. *Id.* at 1156. When they arrived, they saw defendant standing inside the open garage attached to his home. *Id.* Officers walked through the open garage door, into the garage, and placed Defendant under arrest. *Id.* Thereafter, officers entered Defendant's home proper and persuaded his sister to consent to a search of it. *Id.* She consented and officers recovered items that incriminated Defendant. *Id.* Before trial, Defendant moved to suppress the evidence from his home. *Id.* As a threshold matter, he contested his warrantless arrest inside the garage.

The government invoked the "doorway" arrest exception under *Vaneaton.* However, the Ninth Circuit found that the government's reliance on the exception was misplaced. *Id.* at 1158. The Ninth Circuit distinguished the facts of this case from *Vaneaton:* "[t]he Government in this case does not claim that the DEA agents, like the officers in *Vaneaton,* remained outside of [defendant's] home to arrest him." *Id.* In doing so, it reiterated that the doorway arrest exception does not apply where "officers cross[] the threshold of the door and enter[] [the defendant's] home before placing him under arrest." *Id.* at 1158.

---

this language does not create a "flat rule permitting warrantless home entry when police officers . . . are pursuing any suspect" for any crime). Thus, *Lange* forecloses Defendants' argument that Santana allows police to enter a home without a showing of exigency to prevent a suspect from retreating away from a doorway arrest. Defs.' MSJ at 20 (Dkt. 28-2).

**MEMORANDUM DECISION AND ORDER - 18**

Finally, in *United States v. Quaempts*, 411 F.3d 1046 (9th Cir. 2005), the Ninth Circuit further construed *Vaneaton's* doorway arrest exception. There, officers were investigating defendant for sexual assault. *Id.* at 1047. They responded to his trailer home, looked through a window, and saw defendant in his bed. *Id.* Officers knocked on the door and asked to talk with him. *Id.* Defendant opened the door from his bed. *Id.* An officer told defendant that he was being placed under arrest for sexual assault. *Id.* Defendant asked about the identity of the complainant. *Id.* When the officer responded, defendant made an arguably incriminating admission. *Id.* Then, the officer instructed defendant to get out of bed and get dressed. *Id.* Defendant complied, stepped out of the trailer, and was taken into custody. *Id.* at 1047-48. Prior to trial, defendant moved to suppress his post-arrest statement. *Id.* at 1048.

The Ninth Circuit refused to apply the "doorway" arrest exception and affirmed the district court's order suppressing Defendant's statement. *Id.* at 1049. In so doing, the Ninth Circuit distinguished the actual doorway from the interior of the home. *Id.* at 1048. It explained that the former is public place where a suspect lacks an expectation of privacy, whereas the latter is within the zone of privacy. *Id.* Thus, where the defendant was in his bed when he was "arrested" and made his incriminating remark, he remained in his zone of privacy. *Id.* It was of no moment that the officers did not actually enter the house to make the arrest; it is the location of the defendant that controls. *Id.*

These cases' holdings accord with *Vaneaton*, which recognized many of the same limiting factors and stressed that its holding was limited to the facts presented. 49 F.3d at 1427. Specifically, the *Vaneaton* court held the "zone of privacy" protected by *Payton* is not implicated where (i) a suspect voluntarily opens the door of his dwelling in response to a noncoercive knock

**MEMORANDUM DECISION AND ORDER - 19**

by the police, (ii) the suspect is arrested in a "public place" and exposed to public view, and (iii) law enforcement's entry into the home does not precede the arrest. *Id.*

Here, Johnson's arrest cannot be considered a public doorway arrest under any sensible reading of this caselaw. Chief Engbaum and the officers who assisted him forcibly pushed open a solid door and physically entered Plaintiffs' home over their express objection to arrest Johnson. This level of intrusion requires a warrant, exigency, or consent under the cases discussed above. Johnson did not voluntarily expose himself to the officers at the time of their entry and arrest. He had terminated his interaction with Chief Engbaum and was attempting to close the door at the time of the entry. Chief Engbaum prevented him from doing so by wedging his foot in the door. And then, officers used force to open the door wide enough to seize Johnson and wrestle him outside. Simply put, Johnson's arrest does not fall under "doorway" arrest exception and it violated his right to privacy.[5] Returning to first principles, that intrusion must be justified by a warrant, exigency, or consent under *Payton*. It was not. Thus, under either the trespassory line of cases, or the reasonable-expectation-of-privacy line of cases, there was a Fourth Amendment violation.

### iii.     *Qualified Immunity*

---

[5] Dicta from the Ninth Circuit and its districts support this conclusion. See *Glazer v. City of Long Beach*, 210 F. Supp. 2d 1131, 1137 (C.D. Cal. April 7, 2000) ("*Payton* prohibits a conclusion that an officer could cross a threshold and come a few feet into a citizen's home to effect an arrest, in the absence of exigency or consent."); *McDowell v. Jefferson Cnty.*, Case No. 15-cv-507-BLW, 2017 U.S. Dist. LEXIS 8437, *8 (D. Idaho Jan. 18, 2017) (an officer who reached inside the home through a partially open door, grabbed the plaintiff, and pulled him out of the house violated the plaintiff's clearly established Fourth Amendment rights); and *Cuevas v. De Roco*, 531 F.3d 726, 730-732 (9th Cir. 2008) (warrantless entry into a home was "presumptively unreasonable" where officers knocked on the door, the plaintiff opened the door four to six inches, officers asked the plaintiff's name, the plaintiff began to swing the door shut, and the officers responded by putting a foot into the door and pushing it open).

**MEMORANDUM DECISION AND ORDER - 20**

Chief Engbaum asserts qualified immunity as a defense to Plaintiffs' warrantless entry claims. That doctrine shields officers from civil liability unless every reasonable officer in the defendant's position would have understood that his behavior violated the right at issue. *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

As Chief Engbaum stresses, the Supreme Court and Ninth Circuit have long recognized the "doorway" arrest exception. *See supra Section III.A.i.* That exception is rooted in reasonable expectation of privacy principles and the concept that an open door is a public place. *Santana*, 427 U.S. at 42. As discussed earlier, the recent *Jones* trespassory line of cases has eroded the breadth of the exception. *See supra Section III.A.i.* Critically, however, the Ninth Circuit has declined to formally overrule *Vaneaton* – and its formulation of the doorway arrest exception – notwithstanding these cases. *Reyes*, 832 Fed. App'x at 490 (for purposes of qualified immunity, "[b]ecause *Jardines* and *Vaneaton* are not "clearly irreconcilable," the latter remains good law."); *Lundin*, 817 F.3d at 1160-1161 (leaving for "another day" the question of whether *Vaneaton* remains good law). As a result, the continued scope and validity of *Vaneaton* remain open to debate. Therefore, not every reasonable officer in Chief Engbaum's position would have understood that his behavior violated Plaintiffs' Fourth Amendment rights. *Perez*, 98 F.4th at 924. The Court will grant Chief Engbaum's assertion of qualified immunity and dismiss Counts I, II, and III (those brought against him in his individual capacity).

### iv.    *Municipal Liability*

Plaintiffs also seek damages from the City of Buhl for the warrantless entry into their home. Municipalities "do not enjoy immunity from suit – either absolute or qualified – under § 1983." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1250 (9th Cir. 2016). Consequently,

Plaintiffs' municipal liability claims can proceed to a trial on damages so long as Plaintiffs can establish that the City bears direct liability for Chief Engbaum's actions under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Here, the City has conceded that Chief Engbaum is a final policy-maker whose decisions are attributable to the City under *Monell*. In other words, the City has admitted that it is liable for the warrantless entry into the home to the extent that the entry violated the Plaintiffs' Fourth Amendment rights. The Court accepts this admission.

The only remaining defenses to liability that the City raises are partial in nature. Specifically, the City claims that Plaintiffs Haresco and A.J. lack standing and asks that their claims be dismissed. The City also argues that Johnson's unlawful arrest claim (Count VII) fails because Johnson has not alleged an absence of probable cause. The Court addresses each of these arguments below.

### v.     *Plaintiffs Haresco and A.J.*

Defendants have filed a separate motion for summary judgment asking the Court to dismiss the claims of Plaintiffs Haresco and A.J. in their entirety as "bootstrapping, parasitic, or derivative" of the claims of Johnson. This motion is specious.

As residents of the home, Ms. Haresco and her daughter clearly have standing to bring a Fourth Amendment challenge to the officers' entry into their private space. *See Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) (an overnight guest has a legitimate expectation of privacy in another party's home and may object to an unlawful search of that home).

Defendants make no argument to the contrary. Instead, Defendants claim that Plaintiffs Haresco and A.J. are improperly seeking to claim damages for seeing their husband and father

**MEMORANDUM DECISION AND ORDER - 22**

violently arrested in their presence. This is an argument about the proper extent of damages, not about standing. It fails on two grounds.

First, where the police have probable cause to arrest a suspect, but improperly enter a private residence without a warrant to conduct that arrest, determining damages is ultimately a question best resolved by the jury. *George v. Long Beach*, 973 F.2d 706, 709 (9th Cir. 1992) (explaining that such questions of "proximate causation . . . [should be] left to the jury if reasonable persons could reach different conclusions."). Second, even if the City successfully convinced a jury that Haresco and A.J. incurred no damages based on the intrusion into their home, they would still be entitled to nominal damages as a matter of law. *Id.* at 708.

Accordingly, the Court will enter judgment for Plaintiff Haresco and A.J. on Count VI as to liability. Further, it will allow the parties to present their respective arguments about damages to a jury.

### vi.    *Plaintiff Johnson's Unlawful Arrest Claim*

In briefing and in the motions hearing, Defendants argued that the Court should dismiss Johnson's unlawful arrest claims (Counts III and VII). They claim the existence of probable cause necessarily defeats an unlawful arrest claim.

That conclusion is incorrect. "The existence of probable cause is necessary but not by itself sufficient to establish an arrest's lawfulness. Even if probable cause is established, a warrantless arrest in the suspect's home is unlawful under both federal and state law in the absence of exigent circumstances." *George*, 973 F.2d at 710. A plaintiff may bring a false arrest claim based on such an arrest. *Id.*

That is exactly the kind of claim Johnson brings here. *See* Compl. ¶ 519 ("Officer Potter and Deputy Gorrell's arresting Eli inside his home was an unreasonable Fourth Amendment

**MEMORANDUM DECISION AND ORDER - 23**

seizure because the officers had no warrant, lacked consent, and there were no exigent circumstances"). As discussed at the motions hearing, Johnson's damages for this claim will likely be duplicative of any damages he can receive for Count VI. However, the Court will allow both claims to proceed to a trial on damages and will consider how best to instruct the jury to avoid overlapping or redundant damages awards after the parties have submitted their proposed jury instructions.

### B.    Plaintiff Johnson's Excessive Force Claim

Johnson brings two excessive force claims against Chief Engbaum, one for each time he was tased (Claims IV and V). He has only moved for summary judgment on the first of these claims, Claim IV. Defendant Engbaum, however, seeks summary judgment on both. For the reasons set forth below, the Court finds that there is a genuine dispute of material fact regarding the degree to which Johnson resisted after Chief Engbaum, Officer Potter, and Deputy Gorrell pushed open his door and began to physically arrest him. This dispute precludes an award of summary judgment in favor of either party on Johnson's excessive force claims.

#### i.    Excessive force standard

Excessive force claims are judged under a "reasonableness" standard. This standard balances "the 'nature and quality of the intrusion'" on the individual against the "'countervailing governmental interests at stake' to determine whether the force used was objectively reasonable under the circumstances." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Courts weighing excessive force claims apply the three non-exclusive factors set forth in *Graham*: (i) the severity of the crime, (ii) the threat the suspect poses to officer and public safety, and (iii) the amount of resistance to arrest exhibited by the suspect. 490 U.S. at 396. Other

**MEMORANDUM DECISION AND ORDER - 24**

factors that courts may consider include (i) whether a warrant was used, (ii) whether the plaintiff resisted or was armed, (iii) the number of suspects or officers involved, (iv) whether the plaintiff was sober, (v) the availability of alternative methods of effecting the arrest, (vi) the nature of the arrest charges, and whether other dangerous or exigent circumstances existed at the time of the arrest. *Chew v. Gates*, 27 F.3d 1432, 1440 n.5 (9th Cir. 1994). None of these factors is dispositive. In every excessive force case, the court must "slosh its way through [the] factbound morass" of information confronting the officer and determine whether the force used was objectively reasonable under the "totality of the circumstances." *Barnes v. Felix*, 605 U.S. 73, 80 (2025) (cleaned up).

As the Supreme Court has repeatedly warned, this test must be applied with sensitivity to the "split-second" nature of police judgments. *See Graham,* 490 U.S. at 397. An exercise of force is not unreasonable simply because it appears avoidable with the benefit of hindsight. *Id.* at 396. The touchstone of a Fourth Amendment excessive force analysis is, and always remains, the reasonableness of the use of force as viewed from the perspective of an officer on the scene. *Id.*

Here, Johnson makes two arguments that Chief Engbaum's use of the taser was unconstitutional as a matter of law.  First, it was unconstitutional for Chief Engbaum to tase Johnson for refusing to open his door. Second, it was unconstitutional for Chief Engbaum to tase Johnson after having first threatened to do so. Pls.' MSJ at 15 (Dkt. 24-3).

The Court agrees that using a taser on a misdemeanor speeding suspect who walked away from a traffic stop simply because that suspect has refused to open the front door to his home would be unlawful under Ninth Circuit law. But that is not what happened here. It is undisputed that Chief Engbaum did not tase Johnson until officers pushed open the door and began to physically subdue and arrest Johnson. The Court must analyze the reasonableness of this use of

**MEMORANDUM DECISION AND ORDER - 25**

force under an objective standard. That standard considers whether Chief Engbaum's actions were reasonable "in light of the facts and circumstances confronting" him at the time he deployed his taser "without regard to [his] underlying intent or motivation." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1116 (9th Cir. 2017). In other words, Chief Engbaum's subjective motive for tasering Johnson is irrelevant. If a reasonable officer standing in his shoes would have found that the taser was an appropriate method of effectuating the arrest, then Johnson's excessive force claim fails.[6]

### ii.    The Graham factors

Under Ninth Circuit law, the use of a taser is considered an "intermediate level of force with physiological effects, high levels of pain, and foreseeable risk of physical injury." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) (cleaned up). The Ninth Circuit has held that the use of such force requires greater justification than the desire to control a passively resistant suspect of a misdemeanor offense. *Id.* at 1093 ("the right to be free from the application of non-trivial force for engaging in passive resistance was clearly established prior to 2008"). Determining whether an officer's use of this level of force is excessive, and thus unreasonable, hinges on application of the *Graham* factors.

The permissible contours of taser use in cases involving misdemeanants is well-established. For instance, in *Gravelet-Blondin*, a bystander exited his home as officers arrested his neighbor. When the police instructed the bystander to "get back," he did not respond and continued to approach; officers tased him. *Id.* at 1089-90. In *Bryan v. Macpherson*, 630 F.3d 805,

---

[6] An excessive force claim presents a discrete constitutional violation going to the manner in which an arrest was made. *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015) (explaining that the force used may be reasonable even where the arrest was unlawful for other reasons, such as a lack of probable cause).

**MEMORANDUM DECISION AND ORDER - 26**

821 (9th Cir. 2010), an officer deployed a taser without warning against a man who had been

stopped for a seatbelt infraction and refused to return to his vehicle. And in *Mattos v. Agarano*,

661 F.3d 433, 446 (9th Cir. 2011), misdemeanor suspects were tased when they refused to exit a

vehicle and get out of officers' way. In each of these cases, the Ninth Circuit found the force

used to be unreasonable. By contrast, it has found the initial use of a taser to catch a suspect who

ran away from an officer during a traffic stop to be reasonable. *Jones v. Las Vegas Metro. Police*

*Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017).

      As these cases illustrate, the first two *Graham* factors favor Johnson. First, the crimes at

issue here are not severe. Johnson was being investigated for speeding and obstructing an

investigation, which are minor offenses. *Gravelet-Blondin*, 728 F.3d at 1091 (failing to comply

with an officer command is not a serious offense); *Davis v. City of Las Vegas*, 478 F.3d 1048,

1055 (9th Cir. 2007) (trespassing and obstructing a police officer were not "serious offenses").

      Second, Johnson posed no objective threat to law enforcement before the scuffle began.

When the confrontation became physical, Johnson was trying to shut his door so that he could

call an attorney. Defendants make half-hearted arguments that Johnson was acting irrationally

and belligerently and that they were concerned for their safety. Defs.' MSJ at 13 (Dkt. 28-2).

That subjective concern does not pass muster under Ninth Circuit law. *See Deorle v. Rutherford*,

272 F.3d 1272, 1281 (9th Cir. 2001) (a "simple statement by an officer that he fears for his safety

or the safety of others is not enough; there must be objective factors to justify such a concern").

Nor is this a case like *Jones*, where the use of a taser may have been the only reasonable method

for the officers to secure Johnson's arrest. Here, Johnson had announced his intention to stay in

his home and call an attorney. Several officers were already on the scene and could have secured

the house pending a search warrant. Indeed, that is precisely what Chief Engbaum proposed upon

**MEMORANDUM DECISION AND ORDER - 27**

arriving on the scene. Defs.' MF ¶ 3 (Dkt. 28-1). Officers did not need to use immediate force to ensure Johnson did not flee his own home.

In these circumstances, Johnson's refusal to open the door was an insufficient reason under binding Ninth Circuit law to use a taser against him. *Gravelet-Blondin*, 728 F.3d at 1094; *Mattos*, 661 F.3d at 446. Defendants make no argument to the contrary.

As both parties implicitly recognize, however, the legality of Chief Engbaum's use of the taser hinges entirely on what happened during the scuffle. If Johnson struck officers and actively resisted arrest by fighting them, as Defendants claim, then Chief Engbaum would at minimum be entitled to summary judgment on qualified immunity grounds. If Johnson was only passively resisting arrest while protecting his head and neck, as Plaintiffs argue, then Chief Engbaum should have known that it was unlawful to use a taser against him. *See Gravelet-Blondin*, 728 F.3d at 1093 (failure to comply with an officer's orders is not active resistance and does not justify the use of intermediate force); *see also Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994) (finding that protestor's "remaining seated, refusing to move, and refusing to bear weight" despite police orders to the contrary constituted "passive resistance"); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130-31 (9th Cir. 2002) (protestors who were chained together with devices and refused to exit a building when ordered were engaged in passive resistance).

Distinguishing between these two possibilities is not an exact science. "Resistance . . . should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer. We must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case."

**MEMORANDUM DECISION AND ORDER - 28**

*Bryan*, 630 F.3d at 830. In short, the extent to which Johnson resisted arrest is a nuanced factual question. Both parties ask the Court to resolve this issue in their favor based on body camera video footage.

      Summary judgment may be based on body camera footage. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Hernandez v. Town of Gilbert*, 989 F.3d 739, 746 (9th Cir. 2021). However, a court may only view the facts in the light depicted by body camera footage to the extent that it blatantly contradicts a party's narrative such that no reasonable jury could find in their favor. *Scott* 550 U.S. at 380; *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022). Where body camera footage is subject to a range of conflicting interpretations that could support a finding in either side's favor, however, it is the province of the jury to resolve the question.  *See, e.g., Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) ("Video evidence, however, can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts"). Furthermore, the Ninth Circuit has cautioned that summary judgment "should be granted sparingly" in excessive force cases "because the reasonableness standard nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom." *Torres v. City of Madera*, 648 F.3d 1119, 1125 (9th Cir. 2011).

      Here, the scuffle that preceded Johnson's arrest was captured on four different body cameras. But it is quick, chaotic, and confusing to watch given the location and angles of the various cameras. And it does not definitively resolve the parties' dispute about what Johnson was doing immediately prior to Chief Engbaum's use of the taser. Chief Engbaum, for example, claims that Johnson hit him with a stiff arm, and that Johnson "fought" Officer Potter and Deputy Gorrell. Defs.' MSJ at 7 (Dkt. 28-2). Johnson denies these accusations, arguing that he

**MEMORANDUM DECISION AND ORDER - 29**

was merely shielding his head and neck against injury while passively resisting arrest. Pls.'
Reply at 20 (Dkt. 34). The Court has carefully reviewed the footage and believes a jury could
find in either party's favor on this issue.

This dispute precludes a ruling on qualified immunity at this stage of the proceedings.
The Court will allow both excessive force claims to proceed to trial and will reconsider
Defendant Engbaum's qualified immunity defense after the jury has made factual findings about
Johnson's resistance during the arrest. *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)
(whether a right is clearly established is a legal issue for the judge to decide, although special
interrogatories to the jury can be used to establish disputed material facts).

### iii.    *Defendants' Motions to Strike*

To support his excessive force claims, Johnson has presented several pieces of evidence
alleging prior misconduct on behalf of Chief Engbaum, Deputy Gorrell, and the City of Buhl
police department. Defendants have moved to strike this evidence as improper character
evidence.

The Court has not, and need not, consider this evidence. The disputed evidence does not
resolve the genuine dispute of material fact regarding Johnson's level of resistance; nor does it
create a genuine dispute of material fact where none existed before. It does not, therefore, have
any bearing on the Court's summary judgment ruling. Accordingly, the Court will deny
Defendants' motions to strike as moot. The Court will consider any evidentiary objections to the
introduction of the disputed evidence at trial.

### <u>CONCLUSION</u>

For the reasons set forth above, the Court orders as follows:

**MEMORANDUM DECISION AND ORDER - 30**

1. Plaintiffs' Motion for Partial Summary Judgment (Dkt. 24) is GRANTED in part as follows:

   a. Chief Engbaum, Officer Potter, and Deputy Gorrell's warrantless entry into Plaintiffs' home violated Plaintiffs' Fourth Amendment right to be free from an unreasonable search of their home.

   b. The Court grants summary judgment on Count VI in Plaintiffs' favor as to liability only.

   c. Chief Engbaum, Officer Potter, and Deputy Gorrell's warrantless arrest of Johnson violated his Fourth Amendment right to be free from an unreasonable seizure.

   d. The Court grants summary judgment on Count VII in Plaintiff Johnson's favor as to liability only.

2. Plaintiffs' Motion for Partial Summary Judgment (Dkt. 24) is DENIED in all other regards.

3. Defendants' Motion for Summary Judgment (Dkt. 28) is GRANTED in part as follows:

   a. Chief Engbaum is entitled to qualified immunity on Plaintiffs' warrantless entry claims. Accordingly, Counts I, II, and III of the complaint are dismissed with prejudice.

4. Defendants' Motion for Summary Judgment (Dkt. 28) is DENIED in all other regards. Plaintiff Johnson's excessive force claims (Count IV and V) will proceed to trial.

5. Defendants' Motion for Summary Judgment as to Haresco and A.J. (Dkt. 30) is DENIED.

6. Defendants' Motions to Strike (Dkts. 38 and 39) are DENIED as moot.

**MEMORANDUM DECISION AND ORDER - 31**

SO ORDERED.



DATED:  September 23, 2025

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge